No. 95-3729
No. 96-1337

Robert Kehoe,                        *
                                     *
        Plaintiff - Appellee,        *
                                     *  Appeal from the United States
v.                                   *  District Court for the Eastern
                                     *  District of Missouri.
Anheuser-Busch, Inc.,                *
                                     *
        Defendant - Appellant.       *


Submitted:  June 12, 1996

Filed:  September 25, 1996


Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Circuit   Judge,
and KORNMANN,[1] District Judge.


FLOYD R. GIBSON, Circuit Judge.

        Following a five-day trial, a jury found that Anheuser-Busch, Inc.
("Anheuser") violated the Age Discrimination in Employment Act ("ADEA"),
29 U.S.C. §§ 621-634 (1994), and the Missouri Human Rights Act ("MHRA"),
Mo. Ann. Stat. §§ 213.010-.137 (Vernon 1983 & Supp. 1996), when it failed
to transfer Robert Kehoe to an open position within the company.  Anheuser
now appeals the district court's[2] denial of its motion for judgment as a
matter of law or, in the alternative, for a new trial.  In addition,
Anheuser challenges the amount of interim front pay awarded by the district

---

[1]The HONORABLE CHARLES B. KORNMANN, United States District
Judge for the District of South Dakota, sitting by designation.

[2]The HONORABLE JEAN C. HAMILTON, Chief United States
District Judge for the Eastern District of Missouri.

court to Kehoe.  We affirm.

## I.  BACKGROUND

In 1983, Anheuser hired Kehoe, who at the time was fifty-five years old, as a sports promotion coordinator within the company's Sports Marketing Group ("SMG").[3]  The SMG is a division of Anheuser that evaluates which segments of the public are interested in certain sports, determines whether the relevant portion of the public includes likely consumers of Anheuser beer, and uses interest in potentially favorable sports as a marketing tool.  Simply put, sports marketing involves selling a product by widely publicizing its brand name before likely consumers.

Sports promotion coordinators are responsible for devising

---

[3]In the course of this litigation, the parties have expended a considerable amount of time quarreling about Kehoe's exact job title.  It appears that Anheuser's own internal memoranda have, in large measure, fomented this dispute.  Although Anheuser originally employed Kehoe as an assistant sports promotion manager, throughout his tenure with the corporation some company documents referred to him as a sports promotion analyst, and still others identified him as a sports promotion administrator.  Moreover, Kehoe's business card contained the description "sports promotion assistant," and evidence introduced at trial suggests that other sports promotion coordinators considered Kehoe to be a member of their rank.  According to Kehoe, his supervisors never informed him of any change in his job title.

This confusion might be reflective of the fact that the SMG is a relatively new organization within Anheuser that has found it expedient to experiment with sundry organizational structures during its first years of existence.  Indeed, other SMG employees who testified at trial had difficulty accurately identifying the exact positions they had previously occupied within the group.  Under these circumstances, in particular, we believe that a person's job title pales in importance to the actual duties performed by the individual on a day to day basis.  Thus, for ease of discussion, we characterize Kehoe as a sports promotion coordinator.  To the extent that Kehoe's responsibilities differed in relevant degree from those of his peers, we take the dissimilarities into account when resolving the merits of this appeal.

promotions to be implemented in conjunction with particular sports. Each coordinator is charged with developing and administering campaigns for the different sports, known as "sports properties," assigned to him. In most cases, the coordinator also attends any promotional affairs and applies the Sports Promotion Evaluation Module ("SPEM") to assess the relative cost and benefit of the event to Anheuser.[4] The sports properties allocated to an individual coordinator can, for a variety of reasons, vary from time to time.

Unlike other sports promotion coordinators, who typically oversee several different sports properties at any given time, Kehoe's primary work responsibilities while in the SMG pertained to the management and operation of the Busch Soccer Club ("BSC"). The club provided Anheuser an opportunity to show community good will in the St. Louis, Missouri area by sponsoring a number of youth soccer teams under the BSC name. Anheuser's initial involvement with the BSC was spearheaded by Denny Long, the president of Anheuser and an avid soccer enthusiast. In fact, trial testimony indicates that Long's passion for soccer and his desire to boost the sport's popularity influenced the SMG's decision to develop a sports promotion coordinator position exclusively for the BSC.[5] To

---

[4]In utilizing the SPEM, the coordinator first determines the number of people exposed to a promotion, both through actual attendance and via media publicity. By comparing this figure to the resources allotted to the event, the coordinator ascertains the cost to Anheuser for every one thousand "impressions." If a certain sport consistently yields a relatively high cost per thousand impressions, the SMG might discontinue funding for that sports property.

[5]In 1984, Joseph Castellano, who was at that time director of the SMG, assigned another sports property, fishing, to Kehoe in an effort to help him obtain the expertise necessary to perform other types of sports promotions. After three months, Kehoe decided, based upon the emphasis placed on the BSC by the upper echelon of Anheuser's management, that he would not be able to devote sufficient time to fishing promotions. Kehoe thus successfully requested to be relieved of fishing duties, and he never again
received a promotional assignment unrelated to the BSC.

be sure, the fact that the SMG, rather than another division of Anheuser, assumed control over BSC activities evidences a motivation for the brewery's association with the club detached from altruistic notions or a desire to pacify the company's chief executive:  It furnished Anheuser an opportunity to market beer.

Until 1986, Anheuser directly paid the expenses of the teams sponsored by the BSC.  In that year, though, Anheuser organized the BSC as an independent nonprofit corporation; from that point on, Anheuser entered into an annual sponsorship agreement with the club, and the fee due under that agreement was paid to the BSC from the SMG sports promotional budget. After its incorporation, the BSC's board of directors included both employees and nonemployees of Anheuser.

Although Kehoe was, of course, employed by Anheuser, the SMG considered him to be a "loaned executive" to the BSC.  Thus, in addition to his formal position with the brewery, he also held miscellaneous titles in his capacity as a BSC official.  From 1983 to 1986, Kehoe served as president of the BSC, and his duties entailed the supervision and administration of all club activity.  In June of 1986, the SMG hired Bob Brunette, who is several months older than Kehoe, as BSC's executive director.  Brunette at that time became Kehoe's supervisor, and Kehoe's title was changed to director of coaching.  There was some overlap between the two positions occupied by Kehoe and Brunette, and it seems fair to say that Brunette rarely made any major decisions without consulting Kehoe. Nonetheless, Brunette was ultimately responsible for the daily administration of the BSC, which included the obligation to develop, supervise, control, and monitor the club's budget.  Kehoe's main duties were selecting all BSC coaches, supervising and evaluating the coaches, assisting BSC coaches with recruiting and practices, attending practices and games, and arranging travel for

the teams. In addition, the SMG required Kehoe, like other sports promotion coordinators, to regularly report to an SMG manager. Kehoe's superiors readily acknowledge that he successfully performed BSC tasks, and it is largely uncontroverted that he had a good work ethic, worked long hours, and was well-liked by his colleagues.

In May of 1989, Mark Lamping became director of the SMG. Shortly after he acceded to this office, Anheuser executives instructed Lamping to reduce the SMG promotional budget. At that time, Bruce Hudson, who had supervised Kehoe for a brief period during 1986, was the SMG manager to whom Kehoe reported and who oversaw the direction of the BSC. By late summer of 1989, Hudson and Lamping had agreed to conserve resources by discontinuing funding to the BSC and eliminating Kehoe's position with Anheuser.[6] On December 6, 1989, the brewery informed Kehoe that his employment was to be terminated, and his last day of work with the company was March 31, 1990. Kehoe, who was the only SMG employee fired as a result of the budget cuts, was then sixty-one years old and was earning $43,344.00 per year.

In approximately late July of 1989, contemporaneous with Lamping's preparation of the SMG's 1990 budget, Steve Sampson, another sports promotion coordinator, announced his resignation. Hudson suggested that the vacancy be filled by Mary Katherine Casso, a twenty-three year old psychology graduate who had worked as a summer intern with the SMG. Lamping concurred in Hudson's recommendation and extended an offer to Casso on September 26, 1989; she accepted and began working for Anheuser in October.

---

[6]The directive from Anheuser's senior management only required Lamping to reduce the SMG's promotional budget, and Kehoe's salary was not considered a promotional expense. Still, Hudson and Lamping claim that they eliminated Kehoe's position as part of their continuing obligation to refrain from "spend[ing] company resources in an irresponsible manner."

Kehoe had not yet been notified that he was to be fired and did not apply for the open position; neither Hudson nor Lamping considered him for the post.

In early 1990, Kehoe applied for the newly created job of director of administration for the BSC.  Hudson, a member of the BSC's board of directors, encouraged Brunette, the BSC's retired executive director, to consider the part-time spot.  Brunette refused, however, and the board ultimately decided to hire Bob Albus at a salary of $12,000 per year.  Three of the six board members who voted on the issue were not employees of Anheuser.

Kehoe subsequently filed suit against Anheuser in the United States District Court for the Eastern District of Missouri, alleging that the company had violated the ADEA and the MHRA by discriminating against him on the basis of his age.  The district court initially granted summary judgment in Anheuser's favor, but this Court reversed in Kehoe v. Anheuser-Busch, Inc., 995 F.2d 117 (8th Cir. 1993).  In that proceeding, we viewed the appeal as a reduction in force case and determined that Kehoe had met his prima facie burden of showing discriminatory discharge due to age.  We also decided that Kehoe's evidence was sufficient to create a jury question as to whether Anheuser's stated legitimate, nondiscriminatory reasons for his discharge were pretextual.

On remand, the case proceeded to trial and the court submitted the following two issues to the jury:  1) whether Anheuser unlawfully discriminated against Kehoe when it eliminated his position; and 2) whether the company committed unlawful age discrimination by failing to transfer Kehoe to an open sports promotion coordinator position.  The jury found for Anheuser on the first question, but returned a verdict for Kehoe on the failure to transfer claim.  Nonetheless, though it was undisputed that Kehoe would have earned the equivalent of $251,590.53 in salary and benefits had he retained a position with Anheuser, the jury awarded

only $60,000 in damages.  The court denied Anheuser's motion for judgment as a matter of law or, alternatively, for a new trial and instead entered judgment in accordance with the verdict.  After a post-trial hearing, the court additionally ordered Anheuser to reinstate Kehoe to the first open position as a sports promotion manager.  Because no such jobs in the St. Louis area were then available, the court in the interim awarded front pay to Kehoe.  The court stressed that Kehoe has a continuing duty to mitigate and specified that the front pay is to be reduced by the amount that he actually earns during the relevant period.

Anheuser presently appeals the district court's judgment.  The company insists that the trial judge committed error in denying its motion for judgment as a matter of law, in instructing the jury, and in fashioning the front pay award.[7]  We consider each of these allegations seriatim.

## II.  DISCUSSION

### A.    Anheuser's Motion for Judgment as a Matter of Law

Our quite limited task when reviewing a district court's denial of a motion for judgment as a matter of law is to adjudge whether there is sufficient evidence to support the jury's verdict.  Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 800 (8th Cir. 1994).  To make this assessment, we must:  (1) consider the evidence in the light most favorable to Kehoe; (2) assume that all conflicts in the evidence were resolved in favor of Kehoe; (3) assume as proved all facts that Kehoe's evidence tended to prove; and (4) give Kehoe the benefit of all favorable inferences that may reasonably be drawn from the facts.  Id.  "Judgment as a matter of

---

[7]In Number 96-1337, Anheuser also appeals the district court's award of attorneys' fees to Kehoe.  The parties, however, have stipulated that our ruling on the underlying judgment will be dispositive of that appeal.

law is appropriate only when all of the evidence points in one direction and is susceptible to no reasonable inference that would sustain the position of the nonmoving party." Tidwell v. Meyer's Bakeries, Inc., No. 95-3506, 1996 WL 471348, at *4 (8th Cir. Aug. 21, 1996). "We must affirm a denial of a motion for judgment as a matter of law if reasonable persons could differ as to the conclusions to be drawn from the evidence." Parrish v. Immanuel Medical Ctr., No. 95-3514, 1996 WL 455555, at *3 (8th Cir. Aug. 14, 1996).

### 1. Unlawful Discrimination

Anheuser first argues that it is entitled to judgment as a matter of law because Kehoe failed in various respects to meet the minimum evidentiary burdens required of him at trial. In support of this claim, however, Anheuser improperly focuses upon the alleged weakness of Kehoe's proof at various stages of the familiar McDonnell Douglas framework applicable in this disparate treatment case.[8] See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-04 (1973) (setting forth the "order and allocation of proof" in a disparate treatment case under Title VII); Krenik v. County of Le Seuer, 47 F.3d 953, 957 (8th Cir. 1995) (observing that the McDonnell Douglas framework applies to cases under the ADEA). Anheuser's reasoning, though, ignores the well-settled law of this circuit, as stated in Morgan v. Arkansas Gazette, 897 F.2d 945, 948 (8th Cir. 1990). In that case, we emphasized that, on an appeal following a full trial in an employment discrimination case, "[t]his court will not assess the adequacy of a party's showing at any particular stage of the McDonnell Douglas analysis." Id. Rather, "[o]nce a finding of discrimination has been made and that judgment is being considered on appeal, the McDonnell Douglas

---

[8]Courts employ the same analysis under both the ADEA and the MHRA. See Gillming v. Simmons Indus., No. 95-3466, 1996 WL 438693, at *6 n.2 (8th Cir. Aug. 6, 1996); McMullin v. McRaven, 882 S.W.2d 772, 774 (Mo. Ct. App. 1994).

presumptions fade away, and the appellate court should simply study the record with a view to determining whether the evidence is sufficient to support whatever finding was made at trial."  Id. (quotation omitted). Once again, then, we find it necessary to remind the litigants that our present obligation is merely to concentrate our efforts "upon the ultimate factual issue of whether the employer intentionally discriminated against the employee."  Id.; see also United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."); Parrish, 1996 WL 455555, at *8 n.2 ("[W]e decline to deviate from our task on appeal of determining whether the evidence is sufficient to support the jury's finding of unlawful discrimination.").

This is not to say that we will never find it necessary, in an appeal from a district court's denial of a motion for judgment as a matter of law, to consider the potency of the plaintiff's prima facie case.  See, e.g., Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1110 (8th Cir.) (refusing to upset jury's verdict where plaintiff had established prima facie case and had presented sufficient evidence of pretext), cert. denied, 115 S. Ct. 355 (1994).  In Gaworski, we undertook an analysis of the Supreme Court's opinion in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).  Gaworski, 17 F.3d at 1108-09.  The Court in Hicks explained that, while rejection of the employer's proffered nondiscriminatory reasons does not compel a verdict for the plaintiff, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Hicks, 509 U.S. at 511.  Applying this axiom in Gaworski, we held:

[I]f (1) the elements of a prima facie case are present,

and (2) there exists sufficient evidence for a reasonable jury to reject the defendant's proffered reasons for its actions, then the evidence is sufficient to allow the jury to determine whether intentional discrimination has occurred, and we are without power to reverse a jury's finding.

Gaworski, 17 F.3d at 1109.

Despite the somewhat expansive tenor of this pronouncement, decisions subsequent to Gaworski have been careful to emphasize that the Supreme Court in Hicks mentioned, even where the employee has refuted the employer's proffered reasons for the adverse employment action, the plaintiff cannot prevail unless he has introduced "evidence that will 'suffice to show intentional discrimination.'" Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1335 (8th Cir. 1996) (quoting Hicks, 509 U.S. at 511). As such, we have concluded that the relevant holding in Gaworski, as set out above, applies only in the presumably rare scenario in which the plaintiff's evidence of pretext serves "double duty." See Boatmen's Bancshares, 26 F.3d at 801. That is, where the proof of pretext "serve[s] the additional purpose of permitting an inference that [unlawful] discrimination was a motivating factor in a plaintiff's termination." Id. In all other cases, the plaintiff "must do more than simply discredit an employer's nondiscriminatory explanation; he must also present evidence capable of proving that the real reason for [the adverse employment action] was discrimination based on [a prohibited criterion]." Id.

For our immediate purposes, then, we have returned full circle to the standard of review embraced by Morgan. When a party challenges the district court's denial of a motion for judgment as a matter of law, we will examine the elements of the prima facie case only in the infrequent circumstance where the plaintiff has shown no independent proof of intentional discrimination and has instead singularly relied upon his evidence of pretext to serve "double duty." In the vast majority of appeals, such as the one

now before us, we need not be distracted by the stages of the McDonnell Douglas framework, and we will continue to focus solely on the "central question" of "whether there was sufficient evidence to decide whether the defendant[] intentionally discriminated against the plaintiff[]." Winbush v. Iowa, 66 F.3d 1471, 1480 (8th Cir. 1995) (Opinion by Judge Lay).

Turning, at last, to the merits of this issue, and viewing the facts in a light most favorable to Kehoe, we decide that he presented sufficient evidence to support the jury's finding of unlawful discrimination. First of all, there was ample evidence to allow the factfinder to infer that Anheuser's proffered nondiscriminatory reasons were a pretext for age discrimination. The company asserted that it did not transfer Kehoe to the open sports promotion coordinator position because he was not qualified to perform that job. In particular, Bruce Hudson and Mark Lamping, Kehoe's superiors, maintained that Kehoe, who has a college degree in physical education, did not possess the analytical or interpersonal skills required by the position. Furthermore, the supervisors alleged that they held severe misgivings about Kehoe's ability to effectively manage a sports promotional budget.

Kehoe countered these contentions with testimony by two former SMG employees, one of whom had supervised Kehoe for a period, indicating that Kehoe was well-liked by his peers and satisfactorily performed a job at the BSC that was not dissimilar to the open sports promotion coordinator position. These witnesses further declared that Kehoe had the competence to conduct the analytical component of the vocation, which included application of the SPEM formula. Kehoe also pointed to the fact that he had, without complaint, assisted in the efficient administration of the BSC's rather large budget, and through frugal spending over the years had even managed to accumulate a $100,000 surplus. In fact, Hudson himself admitted that, with training, Kehoe could capably perform most, if not all, of the functions demanded of a typical

11

sports promotion coordinator.[9]  Moreover, though Anheuser implies that Kehoe did not have the educational background or experience to succeed in a marketing career, the person ultimately hired by the SMG had received a degree in psychology and only enjoyed the experience that a summer internship with Anheuser had provided.

In addition to these facts discrediting Anheuser's proffered reasons for the failure to transfer, Kehoe also introduced other evidence "that would allow a jury reasonably to infer that the real reason for the adverse employment action was intentional discrimination." Rothmeier, 85 F.3d at 1336.  Significantly, Kehoe demonstrated that he was the only person within the SMG to lose his job as a result of the cuts in the promotional budget, and he showed that younger sports promotion coordinators had retained their positions even after the SMG had discontinued funding for certain of their sports properties.  Most telling, though, was the testimony regarding assorted statements attributed to Hudson.  Credible evidence indicated that Hudson, when discussing the attendance of Kehoe and Brunette at yearly marketing meetings, commented, "What are these guys going to do?  Sit in back, fall asleep?"  Hudson also reportedly referred to the two older men as "moochers" and "leeches," stated that they were not part of the "group," and intimated that the budget cuts gave him an opportunity to "get rid of" Kehoe.  One witness testified that Hudson desired to relocate Kehoe's office away from Anheuser's corporate premises in order to "get him out of the way."  Additionally, evidence suggested that Hudson called Kehoe an "old fart" and described the BSC as a "retirement center" where he had been "put out to pasture."  Finally, with regard to the distribution of promotional

---

[9]After Hudson made this concession, Anheuser was reduced to arguing that, although Kehoe might have been able to perform the "discrete parts" of a sports promotion coordinator position, he was incapable of competently synthesizing all of his skills to engage in the "big picture" of "overall marketing."

assignments, Hudson was said to have lamented, "What am I going to give [Kehoe]?  Senior golf?"

Anheuser propounds that these statements were mere "stray remarks" unrelated to the transfer decision at issue, but we cannot agree.  Hudson was Kehoe's immediate supervisor, and he was also the person who made the recommendation to Lamping about who should fill the vacant position.  Significantly, the person whom Hudson initially endorsed for the job, Mary Catherine Casso, ended up receiving the post.  Though Lamping, who was one step above Hudson in the SMG's management hierarchy, stated that he regarded Kehoe as unqualified for the position, he admitted that he actually had very little contact with Kehoe and relied on Hudson's estimation of the employee's abilities.  Thus, far from being "stray remarks," we conclude that Hudson's comments exemplify "statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude of an extent sufficient to permit the jury to infer that that attitude was more likely than not a motivating factor in the employer's decision."  Nelson v. J.C. Penney Co., 75 F.3d 343, 345 (8th Cir. 1996) (quotations and alteration omitted), petition for cert. filed, 64 U.S.L.W. 3795 (U.S. May 20, 1996) (No. 95-1878).

Because Kehoe produced sufficient evidence to support the jury's finding of age discrimination, the district court correctly refused to grant Anheuser's motion for judgment as a matter of law.

### 2.    Irrational Verdict

The parties agreed that, had Anheuser transferred Kehoe to the open position, between the time of his discharge and the date of his trial he would have earned $251,590.53 in salary and benefits.  The jury, however, only awarded Kehoe $60,000 in back pay.  Anheuser now claims that this disparity reveals the jury compensated Kehoe for his failure to procure employment as the

13

BSC's director of administration, an occupation that would have paid roughly $60,000 during the same interval. Therefore, as the BSC is a separate corporate entity for whose acts the brewery cannot legally be held accountable, Anheuser alleges that it is entitled to judgment as a matter of law.

This argument need not occupy us for long. We recently reiterated:

> Given correct instruction on the law and no clear disregard for that instruction on the face of the verdict, a jury verdict must remain immune from questioning by the district court and from speculation by an appellate court that the verdict may be based on a misunderstanding of the law.

T.H.S. Northstar Assocs. v. W.R. Grace & Co., 66 F.3d 173, 178 (8th Cir. 1995) (quotation and alteration omitted). Stated another way, "mere speculation that a jury verdict may have been based on the jury's own misunderstanding of the law, even though properly instructed, is an insufficient basis on which to upset a jury verdict." Gander v. FMC Corp., 892 F.2d 1373, 1379 (8th Cir. 1990), cert. denied, 498 U.S. 878 (1990). In the case now before us, the district court correctly advised the jury that Anheuser would be liable on the pertinent cause of action only if the company, for a statutorily prohibited reason, "did not transfer Plaintiff to one or more open positions in the Sports Marketing Group." Nowhere do the instructions even remotely insinuate that Anheuser could be held accountable for the BSC's rejection of Kehoe's application. The properly instructed jury returned an internally consistent verdict; thus, Anheuser is not entitled to judgment as a matter of law.[10] See W.R. Grace, 66 F.3d at 178.

---

[10]To the extent that Anheuser intends to argue that the grounds asserted in support of its motion for judgment as a matter of law would provide a basis for granting a new trial, we decide that the district court did not abuse its discretion when it rejected these allegations and declined to order a new trial. See Boatmen's Bancshares, 26 F.3d at 800 (recounting that we review the denial of a motion for a new trial under the abuse of discretion standard).

## B.    The Jury Instructions

Anheuser complains that the district court failed to instruct the jury that Kehoe could not prevail on the failure to transfer claim unless he proved he applied for the open sports promotion coordinator position. Also, the company avers that the instructions did not appropriately describe the type of causation required under the ADEA. Anheuser submitted objections on both of these points at the district court's charge conference, but it failed to tender alternate instructions containing what it considered to be a correct articulation of the law.

In order to properly preserve a claim of instructional error for appellate review, a party is not only required to make a sufficiently precise objection before the district court, see Jones Truck Lines, Inc. v. Full Serv. Leasing Corp., 83 F.3d 253, 256 (8th Cir. 1996), but it must also propose an alternate instruction, see Grogan V. Garner, 806 F.2d 829, 837 n.10 (8th Cir. 1986). Otherwise, the claim is waived, and we will reverse only if the district court's instructions constitute plain error. See Jones Truck Lines, 83 F.3d at 256-257. Consequently, because Anheuser did not offer alternate instructions to the district court, reversal will be appropriate here only if the asserted error "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." Id. at 257 (quotation omitted).

### 1.    The application requirement

Anheuser insists that the district court committed reversible error when it neglected to instruct the jury on an important

element of Kehoe's prima facie case.[11]  Namely, the company contends that the court should have instructed the jury that the employee was obliged to apply for the open position.  While Anheuser is correct that the application requirement is normally considered a component of the plaintiff's prima facie case, we cannot conclude that the district court committed plain error.

As we have already discussed, this Court has expressly held that an employee's strong prima facie showing, acting in concert with evidence of pretext sufficient to raise an inference of discrimination, is an adequate foundation for a plaintiff's verdict.  See Rothmeier, 85 F.3d at 1336-37.  Accordingly, the district courts in this circuit are constrained to instruct juries on the elements of the prima facie case.[12]  Nonetheless, while district judges should, as always, strive to accurately advise the jurors of the law, an otherwise unremarkable error in the

---

[11]To establish a prima facie case on a failure to transfer claim under the ADEA, the plaintiff must ordinarily show:  1) he is a member of a protected class; 2) he applied for and was denied a position for which he was qualified; and 3) the position was given to a significantly younger person. See O'Connor v. Consolidated Coin Caterers Corp., 116 S. Ct. 1307, 1310 (1996) (holding that, for purposes of the ADEA, a plaintiff establishes a prima facie case by showing, inter alia, that his replacement is significantly younger); Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1310 (8th Cir. 1995) (listing prima facie elements in similar failure to promote context).

[12]We note in passing that other courts of appeals have indicated that district courts should refrain from instructing on the elements of the prima facie case. See, e.g., Woodhouse v. Magnolia Hosp., No. 95-60697, 1996 WL 444257, at *7 (5th Cir. Aug. 6, 1996) ("[I]t is improper to instruct the jury on the elements of the prima facie case."); Gehring v. Case Corp., 43 F.3d 340, 343 (7th Cir. 1994) ("Once the judge [in pretrial proceedings] finds that the plaintiff has made the minimum necessary demonstration (the 'prima facie case') and that the defendant has produced an age-neutral explanation, the burden-shifting apparatus has served its purpose, and the only remaining question--the only question the jury need answer--is whether the plaintiff is a victim of intentional discrimination."), cert. denied, 115 S. Ct. 2612 (1995).

instruction describing the prima facie case will diminish in significance where the plaintiff has presented ample evidence to support the ultimate finding of unlawful discrimination.

Here, Kehoe's evidence was sufficient to support the jury's conclusion that Anheuser intentionally discriminated against him because of his age. Thus, even assuming, without deciding, that the district court's instruction was faulty,[13] any error could not be considered plain. It was within the jury's purview to find in Kehoe's favor on the ultimate question of unlawful discrimination; it follows, then, that any flaw in the instruction addressing the prima facie case could not have "seriously affected the fairness, integrity, or public reputation of the judicial

---

[13]The Supreme Court has observed that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), and the Court has emphasized that "the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations," McDonnell Douglas, 411 U.S. at 802 n.13. Hence, although it is usually necessary for a plaintiff to show that he applied for an available position, that element of the prima facie case will be excused where he demonstrates that the employer "'had some reason or duty to consider him for the post.'" Fowle v. C & C Cola, 868 F.2d 59, 68 (3d Cir. 1989) (quoting Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984)); see also Chambers v. Wynne Sch. Dist., 909 F.2d 1214, 1217 (8th Cir. 1990) (discussing other situations in which formal application will be excused).

In the case sub judice, Kehoe presented evidence tending to show that his supervisors knew they were going to eliminate his position at the same time that they were surveying candidates for the available job as a sports promotion coordinator. Kehoe, though, did not learn that he was going to be fired until after the post had already been filled. Under these circumstances, we would be inclined to hold, as a matter of law, that the application requirement should be excused because Anheuser had a reason or duty to consider Kehoe for the job. See Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996) ("It would be ironic--bizarre, in fact--if a victim of discrimination were unable to vindicate her rights because she had the peculiar misfortune of being discriminated against in a way that necessarily prevented her from making her prima facie case.").

**17**

proceedings."

<u>Jones Truck Lines</u>, 83 F.3d at 257 (quotation omitted).

## 2.  Causation

Anheuser next urges us to remand for a new trial because the district court's charge on causation was erroneous.  Our independent review of the instructions, however, discloses no error.  Instruction seventeen informed the jury that "an employer may lawfully choose not to hire or reassign an employee to a specific position so long as age is not a reason for the decision."  Another instruction added that Anheuser was at liberty to fire Kehoe "at any time for any reason whatsoever except that Plaintiff's employment could not be terminated because of his age."  We believe that these statements and others satisfactorily conveyed to the jury that Anheuser could be liable under the ADEA for disparate treatment only if Kehoe's age "actually played a role in [Anheuser's decisionmaking] process and had a determinative influence on the outcome."  <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993); <u>see also</u> <u>Miller v. Cigna Corp.</u>, 47 F.3d 586, 592-98 (3d Cir. 1995) (en banc)(discussing the impact of recent Supreme Court opinions on the causation requirement in disparate treatment cases).  The district court did not commit any error, much less plain error, when instructing the jury on causation.

## C.  Front Pay

Finally, Anheuser argues that Kehoe has failed to mitigate his damages.  The company thus maintains that the district court should have reduced the interim front pay award by the amount Kehoe <u>could</u> earn, instead of by the amount he <u>actually</u> earns, during the relevant period.  It is axiomatic that "[t]he ADEA requires that plaintiffs use reasonable efforts to obtain other employment after termination."  <u>Rhodes v. Guiberson Oil Tools</u>, 82 F.3d 615, 621 (5th Cir. 1996).  The burden is upon the defendant employer, though, to show that the plaintiff has not fulfilled this mitigation

**19**

requirement.  <u>Smith v. World Ins. Co.</u>, 38 F.3d 1456, 1465 (8th Cir. 1994).
We will "review a finding that a plaintiff used reasonable efforts to
obtain other employment as a determination of fact, reversible only if
clearly erroneous."  <u>Rhodes</u>, 82 F.3d at 621.

We have read the rather long transcript in this case, and we cannot
classify as clearly erroneous the district court's decision that Kehoe has
taken adequate measures to mitigate his damages.  Therefore, we will not
disturb the interim front pay award.

**III.  CONCLUSION**

There was sufficient evidence to support the jury's verdict, and the
district court properly refused to grant Anheuser's motion for judgment as
a matter of law.  Because the company has failed to persuade us that any
other grounds warrant reversal, we affirm.[14]

AFFIRMED.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[14]We also affirm the district court's award of attorneys'
fees in Number 96-1337.