# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 95-4058

_____

Judith A. Feltmann,                     *
                                        *
        Appellee,                       *
                                        *   Appeal from the United States
    v.                                  *   District Court for the
                                        *   Eastern District of Missouri.
Sieben, doing business as               *
Plaza Motors Company, Inc.,             *
                                        *
        Appellant.                      *

_____

Submitted:  June 12, 1996

    Filed:  March 20, 1997

_____

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
    ROSENBAUM,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

Sieben, Inc. (Sieben) appeals from the judgment entered against it in Judith A. Feltmann's action alleging sex discrimination and retaliatory discharge under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Title VII), the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010 et seq. (MHRA), and Missouri common law.  We reverse.

_____

[1]The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota, sitting by designation.

Plaza Infiniti is one of eight automobile franchises owned and operated by Sieben and housed at Sieben's Plaza Motor Company (Plaza). Bob Rich, then sales manager at Plaza Infiniti, hired Feltmann as a sales consultant in September of 1991. Feltmann was the only female consultant at any of the Plaza franchises. During 1992, Feltmann's only full year at Plaza, Infiniti executives named her to the Pinnacle Club, an elite group of consultants recognized for high sales and consumer satisfaction.

In the summer of 1992, Infiniti instituted an incentive program that awarded consultants bonuses for each car sold. Overall sales were high, and Rich had little time to evaluate the consultants' selling methods. When overall sales began to decline after the incentive program ended, Rich felt pressured to increase sales and began evaluating consultants and requesting them to increase sales. Feltmann's sales declined after the incentive program, but she was still above half of all consultants for 1992 and, in December, tied with another consultant for the most sales that month. Feltmann's average gross profit for December of 1992, however, as well as January through April of 1993, was the lowest of all consultants. Rich testified that Feltmann's low profits on each car resulted from her failure to thoroughly explain the cars' features, a sales tactic that results in a higher selling price.

In November 1992, Feltmann's co-worker Mike Barnstead told her that Gordon Anzalone, a Sieben employee who worked at a different franchise, had called her an extremely vulgar name. Feltmann wrote a letter to Rich the next day about the comment, and Rich reported the incident to Tony Pandjiris, the manager of Plaza Motors. Feltmann ultimately met with John and Tom Capps, Sieben's owners,

who told Feltmann to report any future incidents. They also asked her if she wanted Anzalone fired, but Feltmann said she did not. They reprimanded Anzalone and told him that if anything like that happened again he would be terminated. Feltmann never heard of any other vulgar comments about her. In early January, however, Barnstead told Feltmann that she had polarized herself from the rest of the sales department and was going to have a thick personnel file. Feltmann assumed that this comment related to her complaint about Anzalone.

On January 4, 1993, Rich sent Feltmann a personal memo regarding her "work ethic." Rich's memo indicated he was unhappy with her method of selling. She was allowing "guest drives"--permitting prospective buyers to take an Infiniti for a short period of time without an accompanying consultant--too often and too soon in the selling process. Rich also thought she was not a "team player" and did not work well with other Plaza employees.

In March 1993, Rich placed Feltmann and another consultant, Rick Beutel, on probation because of their low sales performance in January and February of 1993. Feltmann and Beutel consequently rebounded by the end of March, and Feltmann sold more automobiles that month than all but one other consultant. Despite her high March sales, Feltmann was not allowed to participate in a sales competition in Chicago. Rich had offered the opportunity to participate to the two top consultants at Plaza Infiniti. When they declined he did not offer the opportunity to Feltmann or to any of several male consultants who wanted to go.

Plaza Infiniti consultants were able to lease, at a low rate, a "demo" Infiniti for personal use. Following the drop in sales after the incentive program, Rich became concerned about costs at the dealership and restricted consultants' use of demo cars to the

St. Louis area. Despite this restriction, Feltmann continued her weekly 300-mile round trips to Marion, Illinois, to visit her husband. On February 23, 1993, Rich sent Feltmann a personal memo reiterating that her use of her demo was restricted to the St. Louis area. No males received such a memo, even though Feltmann contends that they took their cars out of the St. Louis area occasionally. Feltmann continued to take her demo to Marion weekly until April 1993, two months after she received the personal memo from Rich and six months after the first restriction.

In January or February of 1993, Feltmann received her federal 1099 tax form, which included bonuses attributed to her from the summer 1992 incentive program. Her 1099 indicated more bonus income than she had actually earned. Casey Jones's and Beutel's 1099s also indicated larger bonuses than they had actually earned. Feltmann obtained copies of the checks addressed to her and discovered that someone had forged her signature for endorsement. The forgeries resulted from the system Plaza Infiniti used to handle consultants' bonus checks. Pandjiris would sign the consultants' checks, deposit them in a group account, and then issue the consultant a check on that account. Some consultants had given Rich and Pandjiris authority to sign their checks if the checks arrived in their absence. Although Feltmann had not given her managers such authority, they signed her name anyway. Feltmann also discovered that she had been credited with sales she did not actually make. Feltmann complained to Rich that her 1099 showed income in excess of what she actually earned. On April 14, 1993, Sieben gave Feltmann a check covering her additional tax liability, but required her to sign a release stating that she held Plaza harmless for any claims relating to the incentive program. Sieben eventually discovered that Jim Schlabach, who had been in charge of the account, had been taking money from it, and terminated him.

Prior to April 9, 1993, Plaza Infiniti's guest drive policy provided that consultants were to use their "best judgment" in permitting a customer to guest drive a car. Feltmann allowed many more guest drives than any other consultant: Sieben's guest drive log reveals that between July of 1992 and April of 1993 she permitted 107, while the highest male consultant permitted forty-eight. In February of 1993, Rich reprimanded Feltmann when she loaned two small Infinitis to Infiniti owners who did not want to drive their own cars in a snowstorm.

On April 9, 1993, Rich announced a new guest drive policy. Consultants were not to loan out any cars without Rich's permission or without logging the cars in the guest drive log book. Overnight guest drives would no longer be permitted, and consultants had to accompany their guests. Before Rich left for a trip the weekend of May 15, he reiterated that no guests could drive the new Q45 without an accompanying consultant. Despite the April 9 memo and Rich's specific instruction, however, Feltmann permitted a customer to take a Q45 alone, and allowed another customer to keep a J30 model for the entire weekend, without getting permission or noting the guest drive in the log book.

The following Monday, May 17, 1993, Rich fired Feltmann because she had allowed these guest drives contrary to his specific instructions. Feltmann requested a meeting to review her discharge. She then met with Rich, Pandjiris, and John and Tom Capps and alleged that she had been discriminated and retaliated against. The Capps told her that they took her allegations very seriously and would investigate her complaints. Ultimately, the Capps found no merit in her allegations. John Capps, however, considered Feltmann a "salvageable employee" and had Pandjiris extend an offer of reinstatement to her. Feltmann declined the offer, however, because Tom Capps refused her demand that he fire

four male sales consultants, did not accord her complaints any merit, and would make no changes at the showroom.  She also refused a position in another Sieben showroom.  Feltmann subsequently worked at Lexus of St. Louis for ten months and then at St. Louis Acura for four months, until major depression, allegedly precipitated by her discharge from Plaza, forced her to quit.

After exhausting her administrative appeals, Feltmann brought this action alleging sex discrimination in violation of Title VII and the MHRA; retaliatory discharge in violation of Title VII and the MHRA; and retaliatory discharge under Missouri common law for reporting the forged checks.  The jury found in favor of Feltmann and awarded her $112,661 in back pay, $20,072.24 in compensatory damages, and $25,000 in punitive damages on her Title VII sex discrimination claim.  Sieben filed a motion for judgment as a matter of law (JAML) or, in the alternative, for a new trial or remittitur.  The district court denied the motion and awarded Feltmann front pay of $72,668.38 for a two year period, together with costs and attorneys' fees.

**II.**

Sieben contends that the district court erred in failing to grant Sieben's motion for JAML on Feltmann's discrimination claims, both because Feltmann failed to establish her prima facie case and because she failed to introduce evidence sufficient to support a finding of discrimination.

We review de novo a district court's denial of a motion for JAML, applying the same standard used by that court.  See Triton Corp. v. Hardrives, Inc., 85 F.3d 343, 345 (8th Cir. 1996).  We must consider the evidence in the light most favorable to Feltmann, assume that all conflicts were resolved in her favor, give her the benefit of all reasonable inferences, and then deny the motion for JAML if reasonable persons could differ regarding the conclusions to be drawn from that evidence.  See, e.g., Ryther v. Kare 11, No. 94-3622, slip. op. at 25-26 (8th Cir. Mar. 6, 1997) (en banc); Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1056 (8th Cir. 1993).

In a discrimination case, the plaintiff bears the initial burden of establishing a prima facie case, which gives rise to a presumption of unlawful discrimination.  See Ryther, slip. op. at 6.  Once the plaintiff establishes the prima facie case, the burden shifts to the employer to produce evidence that its complained-of action was based on a legitimate, nondiscriminatory reason.  See id.  Upon the employer's satisfactory production of such evidence, the presumption of discrimination drops out, and the only remaining issue is the ultimate question of whether the employer intentionally discriminated against the plaintiff.  See id.

When reviewing the denial of a motion for JAML on a discrimination claim, however, we need not "re-engage in the [prima-facie step] analysis . . ., but instead limit our review to the ultimate factual issue of whether [the defendant] intentionally discriminated on the basis of [the plaintiff's] sex."  Karcher v. Emerson Elec. Co., 94 F.3d 502, 507 (8th Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3587 (Feb. 5, 1997); see also Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1101 (8th Cir. 1996); Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 733 (8th Cir. 1996); Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 800-01 (8th Cir. 1994).

Thus, we must determine whether Feltmann adduced evidence "`capable of proving that the real reason for h[er] termination was discrimination based on [gender].'" Nelson v. J.C. Penney Co., Inc., 75 F.3d 343, 345 (8th Cir.) (quoting Boatmen's Bancshares, 26 F.3d at 801), cert. denied, 117 S. Ct. 61 (1996). Feltmann was required to produce evidence of conduct or statements by persons involved in Sieben's decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in Sieben's decision to fire Feltmann. See J.C. Penney, 75 F.3d at 345; Kehoe, 96 F.3d at 1102; Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 174 (8th Cir. 1992). "We do not sit to determine if this reason is based on sound principles of business judgment . . . . Rather, the relevant inquiry is whether [Sieben's] decision was based on [gender]." Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1312 (8th Cir. 1995). Giving Feltmann the benefit of all reasonable inferences, we find no conduct or statements by persons involved in Sieben's decision to fire Feltmann from which a jury could reasonably infer that a discriminatory attitude was a motivating factor in Sieben's decision to discharge Feltmann.

Feltmann claims that she was treated differently from similarly situated male consultants, an allegation which, if established by evidence, would support a finding of sex discrimination. See Kientzy, 990 F.2d at 1060. The litany of incidents Feltmann recites, however, fails to support an inference of disparate treatment. Although Feltmann alone received a memo regarding her work ethic, Rich also talked to a male consultant about his work ethic, and Feltmann does not offer evidence of any other consultants whose work ethic Rich questioned but did not reprimand. Similarly, the fact that Rich put Feltmann on probation does not show discriminatory treatment, since Rich also put Feltmann's male coworker Casey Jones on probation for the same

reason--declining sales in January and February 1993. Feltmann's contention that she was never given permission to allow a guest drive after April 9, 1993, though male consultants were, is also unconvincing. Feltmann could only specify one instance when Rich denied her permission after April 9, and he denied permission to at least two male consultants as well. Similarly, Feltmann's allegation that she was fired for not logging out two cars but that males who failed to log cars out were not reprimanded is unpersuasive. Feltmann was fired in part because she failed to ask permission, yet she admitted that she knew of no instance when a male consultant allowed a guest drive without getting permission. Thus, even though these male consultants may have been treated differently, they "cannot be considered similarly situated." Johnson v. Baptist Medical Center, 97 F.3d 1070, 1073 (8th Cir. 1996). In addition, Rich believed, and Feltmann admitted, that by not logging cars out or asking for permission, Feltmann was attempting to hide her actions from Rich.

Feltmann's other examples of disparate treatment are without merit. Her allegation that Rich swapped one of her "house deals" (a deal brought in by a non-consultant and assigned to a consultant) with a less-profitable deal originally assigned to a male loses force when we consider that Feltmann, and no other consultant, had been given forty-one clients belonging to a consultant who left Plaza. Likewise, her claim that she was forced to drive her rear-wheel-drive Q45 in a snowstorm while the males could drive front-wheel-drive G20s is weakened by the fact that the male consultants asked for permission, but Feltmann did not. The fact that Rich sent Feltmann a personal memo reprimanding her for violating his November demo car memo, while males were not reprimanded, is similarly unhelpful; Feltmann drove her demo 300 miles every weekend until April of 1993, while the males' use was occasional at most and chiefly took place prior to Rich's November

1992 memo.  Feltmann's claim that Rich refused to switch tires on a car Feltmann sold, although it "had been done in the past," proves nothing. Rich explained that he would no longer switch tires for anyone because tires are federally registered with a particular automobile and switching them created problems.  Feltmann's claim that she, and no males, had to pay for the new, expensive Q45 brochures is likewise not persuasive;  Feltmann was the only person who expressed a desire to furnish her customers with personal brochures, and she failed to prove that male consultants were given free brochures.  Finally, with regard to Feltmann's allegation that Rich did not allow her to participate in the sales competition in Chicago, we note that the two men Rich wanted to send were Plaza's "two best salespeople," and he did not give the opportunity to any of several male consultants who wanted to participate in the competition.

Feltmann claims that Rich approved one male consultant's deal that yielded a lower profit than one of her deals that Rich denied.  She also claims that Rich would not get off the phone to sign service orders for her, although he would for male consultants.  Because she failed to introduce any specific evidence to substantiate these vague and conclusory claims, however, they are insufficient to support a claim of disparate treatment.  See Lidge-Myrtil, 49 F.3d at 1311-12; Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994).

We recognize that a jury may discredit or disbelieve whatever alleged facts are inconsistent with its conclusion, including the employer's proffered reason for the plaintiff's discharge, as long as evidence supports the jury's verdict.  See Lavender v. Kurn, 327 U.S. 645, 653 (1946), quoted in Ryther, slip. op. at 27.  As this statement presupposes, however, sufficient evidence must still exist to form a basis upon which a reasonable jury could rest its

conclusion that the employer's decision stemmed from intentional discrimination.  See Ryther, slip. op. at 8-10, 25.  Because there was an absence of such evidence, the district court should have granted Sieben's motion for JAML on Feltmann's discrimination claims.

### III.

Sieben next asserts that Feltmann failed to establish a prima facie case that she was retaliated against for reporting Anzalone's profane, harassing comment.  To establish a prima facie case of retaliation, Feltmann must show that she complained of the harassing comment, that Sieben took adverse action against her, and that the adverse action was causally linked to her complaint.  See Marzec v. Marsh, 990 F.2d 393, 396 (8th Cir. 1993).

We conclude that Feltmann failed to establish the necessary connection between her report and her discharge.  Anzalone had no input into Sieben's termination decisions and worked at a different franchise on the Plaza Motors premises.  The only evidence of retaliation Feltmann offered was Barnstead's comment that Feltmann had "polarized" herself from the rest of the salespeople and that she was going to have a "thick" personnel file.  Barnstead, however, had no input into Sieben's firing decisions, and Feltmann offered no evidence that Barnstead's remark even related to her report.  Anzalone's and Barnstead's remarks are "insufficiently serious" to support an inference of Sieben's retaliatory intent.  See Johnson, 97 F.3d at 1073.  Feltmann also alleged that her coworkers treated her "unfairly" and that her managers "singled her out."  Such conclusory and unsubstantiated allegations, however, fail to support Feltmann's claim of retaliation.  See Davenport, 30 F.3d at 945.

Furthermore, Rich, who ultimately discharged Feltmann, was concerned about Anzalone's comment and was principally responsible for bringing it to the Capps' attention.  Similarly, the Capps' concern in dealing with the incident suggests, if anything, that Sieben was willing to confront and rectify Feltmann's harassment claims.  Feltmann herself admitted that her complaint was handled efficiently and to her satisfaction.  Finally, Rich did not discharge Feltmann until six months after she reported Anzalone's comment.  The fact of termination six months after an incident is by itself insufficient to support a claim of causal connection.  See Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992).  Because Feltmann failed to adduce any evidence capable of proving a causal connection between her report and discharge, the district court erred in not granting JAML on this count of Feltmann's complaint.

## IV.

We conclude that the same failure of proof exists with respect to Feltmann's allegation that she was fired for reporting the problems with the incentive bonus account.  Sieben terminated Schlabach upon discovering that he had been taking money from the bonus account, which suggests that Sieben was not trying to protect itself or Schlabach.  Moreover, Schlabach was not Feltmann's superior and was not involved in the decision to fire Feltmann.  Although Feltmann notes that Rich discharged her six weeks after the complaint, mere temporal proximity is insufficient to link Feltmann's report to her discharge.  See J.C. Penney, 75 F.3d at 346-47 (plaintiff fired a month after he filed age discrimination charge failed to establish causal link without evidence in addition to temporal proximity); Caudill v. Farmland Indus., Inc., 919 F.2d 83, 86-87 (8th Cir. 1990) (close proximity between plaintiff's

-12-

filing of charges and plaintiff's discharge was a mere "slender reed of evidence"; any conclusion of temporal proximity would be "rank speculation"). Accordingly, the district court should have granted Sieben's motion for JAML on this count.

**V.**

Because Feltmann's claims find no support in the evidence, her claim for punitive damages must perforce also fail.

The judgment is reversed, and the case is remanded to the district court with directions to enter judgment in favor of Sieben, Inc.

A true copy.

    Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.