**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3248EA

_____

Lucille P. Gartman,                              *
                                                 *
              Appellee,                          *
                                                 *
      v.                                         *
                                                 *
Gencorp Inc., formerly known as                  *
Diversitech General, Inc., doing                 *
business as Gencorp Automotive, Inc.,            *
                                                 *
              Appellant.                         *


_____

No. 96-3466EA                    Appeals from the United States
                                 District Court for the Eastern
_____                      District of Arkansas.

Lucille P. Gartman,                              *
                                                 *
              Appellant,                         *
                                                 *
      v.                                         *
                                                 *
Gencorp Inc., formerly known as                  *
Diversitech General, Inc., doing                 *
business as Gencorp Automotive, Inc.,            *
                                                 *
              Appellee.                          *

_____

Submitted:  April 16, 1997
Filed:  July 16, 1997
_____

Before FAGG, FLOYD R. GIBSON, and MURPHY, Circuit Judges.
_____

FAGG, Circuit Judge.

In a shake-up at its Batesville, Arkansas plant, Gencorp Inc. discharged three managers and offered transfers to three others, including Batesville's quality manager, Lucille P. Gartman.  Gartman rejected the offer and resigned, and then brought suit against Gencorp under 42 U.S.C. §§ 2000e to 2000e-17 (1994) (Title VII), claiming she had been constructively discharged because of her gender.  The jury found in Gartman's favor, awarding her $14,904 in lost wages, $67,715 in compensatory damages, and $250,000 in punitive damages.  The district court set aside the punitive damages award, but denied Gencorp's motion for judgment as a matter of law (JAML).  Gencorp appeals, and we reverse.

Reviewing the denial of Gencorp's motion for JAML, we view the evidence in the light most favorable to Gartman, resolving evidentiary conflicts in Gartman's favor and giving Gartman the benefit of all reasonable inferences from the evidence.  See Feltmann v. Sieben, 108 F.3d 970, 974 (8th Cir. 1997).  Our summary of the facts is shaped by these rules.  Gencorp's vehicle sealing division  manufactures vehicle door and window seals.  In 1992 and 1993, Ford Motor, a major customer, rejected more seals from Gencorp's Batesville plant than from three other Gencorp vehicle sealing plants combined.  Over a six-month period, the Batesville plant had the worst quality record of all thirteen Ford vehicle seal suppliers.  Ford placed the Batesville plant on its "twenty worst suppliers" list--a list Gartman testified "[y]ou do everything in your

power to get off of"--and threatened to pull its business from Batesville. The situation was critical for Gencorp because Batesville sold roughly seventy percent of its output to Ford.

Although Gartman was Batesville's quality manager, division president Wayne Smith held Batesville's management team as a whole responsible for the plant's quality failures. Smith decided to replace six Batesville managers. He fired three male managers outright, and offered transfers to two other males and Gartman. Plant manager J.W. Burton accepted a transfer to Gencorp's Wabash, Indiana design and engineering facility, and production manager Dennis DeLaat transferred to Gencorp's Michigan sales office. In August 1993, Gartman was offered the quality manager position at Gencorp's Wabash plant, with moving expenses paid and no reduction in salary or benefits. A week later, Gartman heard Smith say the Wabash plant would be closing. Alarmed by Smith's statement, Gartman spoke with the president of Gencorp, who told Gartman "we'll relocate good people" when Wabash closes. Batesville's human resources manager, Gary Moore, also encouraged Gartman to view the transfer positively, but Gartman refused the transfer and resigned. Moore testified without contradiction that Gartman told him personal and family reasons prompted her decision. Along the same lines, not only did Gartman reject the move to Wabash, but she testified she would have refused the transfer Burton accepted as well.

Several months earlier, Gartman was present when division vice president Walt Hunnicutt learned Ford Motor had named a woman to monitor supplier quality and said, "S--t, another gal." Hunnicutt testified he made the remark out of frustration with the job performance of a female member of Ford's purchasing group. Gartman also felt belittled by several insulting comments Smith made in December 1992. Smith told Gartman she did not know "how to belly up to the bar," called her "kid" in a patronizing manner, and advised her not to show her ignorance by referring to an engine when she meant a block. Gartman testified she was told that Smith was jealous of her presentation skills and threatened by her knowledge and competence.

We review de novo the district court's denial of Gencorp's motion for JAML. See Feltmann, 108 F.3d at 974. We must affirm "if reasonable persons could differ regarding the conclusions to be drawn from [the] evidence." Id. By the same token, we must reverse if the evidence is insufficient to support a reasonable inference that Gartman was constructively discharged, see Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996), or, if she was, that a discriminatory attitude was a motivating factor in her discharge, see Feltmann, 108 F.3d at 975. "Constructive discharge occurs when an employer 'deliberately renders the employee's working conditions intolerable and thus forces the employee to quit [her] job.'" Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796 (8th Cir. 1996) (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981)). The employee must show that a reasonable person in her situation would find the working conditions intolerable. See id. In other words, "intolerability of working conditions is judged by an objective standard, not the [employee's] subjective feelings." Id. Further, the employer must have intended to force the employee to quit. See id. Constructive discharge plaintiffs may prove intent "by showing their resignation was a reasonably foreseeable consequence of their employers' discriminatory actions." Hukkanen v. International Union of Operating Eng'rs, 3 F.3d 281, 285 (8th Cir. 1993).

Without doubt, the choice Gartman faced between pulling up roots for a fresh start in a plant with an uncertain future or resigning was a painful one. But although "[t]here may be situations in which a transfer to another location is so intolerable . . . that a finding of constructive discharge is warranted," Bradford v. Norfolk S. Corp., 54 F.3d 1412, 1420 (8th Cir. 1995), the record in this case does not support an inference that a reasonable person in Gartman's place would have considered Gartman's situation intolerable. Assuming Wabash would shortly close, Gencorp's transfer offer still presented Gartman the opportunity to retain her quality manager title and to continue doing the same work, drawing the same pay, and enjoying the same benefits as before while looking for something more permanent. On these facts, Gartman cannot claim Gencorp treated her adversely when it made the transfer offer, see Harlston v.

McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994), and Wabash's clouded future was insufficient, in itself, to transform a benign employment decision into an objectively intolerable situation. After all, it was possible Wabash would remain open, as in fact it still was at the time of trial. Further, Gencorp president Marv Isles reassured Gartman that Gencorp would relocate good people when Wabash closed. Gartman disbelieved Isles, but "'[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast.'" West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995) (quoting Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir. 1990) (emphasis in Smith)); see also Bradford, 54 F.3d at 1420 ("[M]ere skepticism [about an employer's] motives is insufficient to generate an inference of discrimination.").

Neither does the evidence support a reasonable inference that Gencorp intended to force Gartman to quit when it offered Gartman the Wabash transfer. Indeed, the evidence is all to the contrary. Batesville stood to lose its biggest customer because of its miserable record in Gartman's area of responsibility. Although Gartman wanted to stay on as Batesville's quality manager, she acknowledged Gencorp had to do everything it could to restore Ford Motor's confidence in Batesville's product. Gencorp did act decisively, firing several members of Batesville's management team and offering transfers to several others. If Gencorp management had wanted to take advantage of Ford Motor's dissatisfaction with quality failures to get rid of Gartman, they could have numbered Gartman among those to be fired. Instead, in an effort to keep her with the company, they offered Gartman a transfer to the Wabash plant. Smith said Wabash was going to close, but nothing in the record indicates Gencorp offered Gartman the Wabash transfer despite having more secure positions available for which Gartman was the best qualified candidate. Gencorp president Marv Isles assured Gartman the future of "good people" did not depend on Wabash's longevity. Nevertheless, for personal and family reasons, Gartman rejected the transfer offer and resigned. See Bradford, 54 F.3d at 1420 (no inference employer intended to force workers to quit when they did so because of personal circumstances). She refused the

transfer on the basis of Smith's single remark about Wabash's future prospects, without checking out Wabash for herself, see id., and without giving Isles a chance to make good on his word, see West, 54 F.3d at 498. On this record, a jury could not reasonably find Gartman was constructively discharged.

Even if we agreed that Gencorp's transfer offer placed Gartman in an objectively intolerable position, and if we also agreed that Gencorp management could reasonably foresee Gartman might reject the transfer and resign, to establish constructive discharge in violation of Title VII Gartman still had to show her resignation was a reasonably foreseeable consequence of discriminatory actions on Gencorp's part. See Hukkanen, 3 F.3d at 285; Chambers v. American Trans Air, Inc., 17 F.3d 998, 1005 (7th Cir. 1994) ("[T]o be actionable under Title VII the work conditions . . . need to be intolerable in a discriminatory way."). We agree with the district court that "the decision to replace the management team at Batesville was motivated by their substandard performance." Batesville's unacceptable quality record was certainly a legitimate reason for removing Gartman as Batesville's quality manager. Gartman nonetheless contends poor quality performance was a cover for gender discrimination because Burton and DeLaat received better transfer offers than she did. Setting aside Moore's testimony that Gartman resigned for personal and family reasons, and Gartman's own testimony that she would have rejected Burton's offer anyway, Gartman's pretext argument fails because Gartman introduced no evidence she was better qualified for the positions Burton and DeLaat received than they were. On the contrary, before their transfers Burton and DeLaat held the top two posts in Batesville's management hierarchy. Even assuming Gartman was equally qualified, no inference of gender discrimination arises when an employer, choosing among similarly qualified candidates, selects a man and not a woman. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258-59 (1981); Chock v. Northwest Airlines, Inc., 113 F.3d 861, 864 (8th Cir. 1997) (race discrimination).

-6-

Finally, although Gartman might have felt belittled by Smith, Smith's rude comments were devoid of gender-conscious terms and thus did not imply a discriminatory attitude toward women as women. See Cram v. Lamson & Sessions Co., 49 F.3d 466, 471-72 (8th Cir. 1995). Indeed, Gartman's own testimony points to personal dislike born of jealousy as the motive force behind Smith's insults. By contrast, Hunnicutt's remark was gender-conscious, but "'[n]ot all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision.'" Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1324 (8th Cir. 1994) (quoting Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir. 1993)). Specifically, an inference of causation is not supported by "'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)). Hunnicutt testified he took part in the decision to offer Gartman a transfer, but the comment at issue was made months before the transfer offer. Unlike those noncontemporaneous statements by decisionmakers that have been held sufficient to support an inference of discrimination, Hunnicutt's impulsive remark, uttered in a passing moment of frustration, bore no relation to the decisional process itself. See Emmel v. Coca-Cola Bottling Co., 95 F.3d 627, 632-33 (7th Cir. 1996) ("[I don't] think the beverage industry [is] where women [are] meant to be."); Stacks, 27 F.3d at 1318 ("[W]omen in sales [are] the worst thing that ha[s] happened to this company."); Radabaugh, 997 F.2d at 449 (corporate planning documents citing youth of managers as positive factor); EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990) ("[I]f it were [my] company [I] would not hire blacks."). In sum, even if Gartman was constructively discharged when Gencorp offered her a transfer to a plant slated for closure, from this evidence a jury could not reasonably infer that a discriminatory attitude was a motivating factor in Gencorp's decision to make the offer.

Because we reverse the district court's denial of Gencorp's motion for JAML, we need not address Gartman's cross-appeal on the issue of punitive damages.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.