78 F.Supp.2d 1002 (2000)
Shelly R. TAPP, Plaintiff,
v.
ST. LOUIS UNIVERSITY, Defendant.
No. 4:98CV1776SNL.
United States District Court, E.D. Missouri, Eastern Division.
January 3, 2000.
*1003 Nelson L. Mitten, Michael A. Ellenhorn, Riezman & Blitz, P.C., Clayton, Ellen W. Dunne, Lowenbaum Partnership, L.L.C., St. Louis, MO, for Shelley R. Tapp, plaintiff.
Teri B. Goldman, Thomas E. Tueth, Partner, Lucy A. Singer, Randall S. Thompson, Cheryl M. Manley, David S. Jones, Blackwell Sanders Peper Martin LLP, St. Louis, MO, for St. Louis University, defendant.

MEMORANDUM
LIMBAUGH, Senior District Judge.
Plaintiff originally filed this employment discrimination case alleging that she had been denied tenure as an Associate Professor of Marketing in defendant's Business School on the basis of an alleged disability and gender. On December 2, 1999 this Court granted the plaintiff leave to dismiss her counts as to disability discrimination. See, Court Order # 45, filed December 2, 1999. Thus, the remaining counts for adjudication before this Court are Count II (Title VII-sex discrimination); Count IV (MHRA-sex discrimination); and Count V (Title IX-sex discrimination). This matter is before the Court on the defendant's motion for summary judgment (# 37), filed November 29, 1999. Responsive pleadings have been filed. This cause of action is set for trial on the Court's jury trial docket of January 18, 2000.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. *1004 Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broad-casting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). Although summary judgment should seldom be granted in employment discrimination cases, it is proper in those cases wherein the plaintiff fails to establish a factual dispute on an essential element of the case. Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1205 (8th Cir.1997), citing Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 762 (8th Cir.1995).
In the context of tenure decisions, the Eighth Circuit Court of Appeals has clearly stated that the above-referenced standard requires some additional considerations due to the "special" circumstances under which such decisions are made. The uniqueness of a tenure decision makes its review by a court a particularly difficult task. "We do not evaluate such decisions for their merit. While Title VII unquestionably applies to tenure decisions, judicial review of such decisions is limited to whether the tenure decision was based on a prohibited factor." Brousard-Norcross v. The Augustana College Assn., 935 F.2d 974, 976 (8th Cir.1991), citing Zahorik v. Cornell Univ., 729 F.2d 85, 93 (2nd Cir. 1984). Courts are not to sit as a "super personnel council" to review tenure decisions. Brousard-Norcross, at 976. Instead, a court should
"accord a high degree of deference to the judgment of university decision-makers regarding candidates' qualifications for academic positions. To prevail, the plaintiff must show something more than a mere dispute over her qualifications for the position. Indeed, in the tenure context, for example, the plaintiff's evidence of pretext must be of such strength and quality as to permit a reasonable finding that the denial of tenure was obviously unsupported."
Kobrin v. Univ. of Minnesota (Kobrin II), 121 F.3d 408, 414 (8th Cir.1997) quoting Kobrin v. Univ. of Minnesota (Kobrin I), 34 F.3d 698, 704 n. 4 (8th Cir.1994).
Given the above-referenced standards for reviewing a summary judgment motion in a denial of tenure case, the Court now reviews the relevant factual background.[1]
In the late summer/early fall of 1990 plaintiff was hire by defendant as a tenuretrack *1005 Assistant Professor of Marketing in the School of Business. Previously, plaintiff had been on the faculty at University of Nebraska as an Assistant Professor of Marketing in a non-tenured track position.
Pursuant to the defendant's Faculty Manual, "[t]enure-track faculty members are individuals who have tenure or are eligible for tenure". Furthermore, "[t]enure is a contractual recognition of the faculty member's right to continuing employment that is subject to termination only by resignation ... retirement, medical reasons ... death, mutual agreement or for one of the causes for termination ...". Also, pursuant to the Faculty Manual, "[t]enure is normally awarded through the review and promotion process ..." and that the defendant normally makes a final decision "to grant tenure to a faculty member no later than the completion of the sixth year of service ... as a tenure-track faculty member at St. Louis University." It is the tenure-track faculty member's responsibility to apply for tenure prior to or during the year in which a final decision as to tenure must be made. Finally, "[t]he University does not recognize de facto tenure; a tenure-track faculty member who is not awarded tenure before or during the year in which the decision must be made will be given a one-year terminal contract, at the end of which the faculty member's appointment ends."
Each school within the University[2] has the same basic organizational structure. The Business School, headed by a Dean, consists of several departments, including marketing. Each department has its own chairperson and faculty (consisting of both tenured and tenure-track faculty members). The marketing department chair is a faculty member appointed to three-year terms by the University's Academic Vice President, based upon a recommendation from the Business School Dean. During the relevant time  period, Dr. Stephen Miller served as the marketing department chair. For the relevant time-period 1993-1996, Dr. Neil Seitz was the Dean of the Business School.
Each school within the University had tenure procedures and policies particular to that school. At all relevant times, under the Business School tenure guidelines, a candidate had to be rated "excellent" in teaching or research and ranked "good" in the second of those two categories. The candidate also had to be rated at least "good" in terms of service to the School and the community. Even if a candidate rated "good" in terms of service, a failure to rate "excellent" in either the category of teaching or research normally precluded a grant of tenure.
Although the written criteria for tenure remained virtually the same from the years of 1990 to 1996, the level of achievement necessary to meet the standard of "excellent" increased steadily, especially with regards to published research. In 1993, after becoming dean of the Business School, Dr. Seitz met with the assistant professors, including the plaintiff, to discuss the general standards for tenure. He informed them of the necessity meeting a higher-quality level both in teaching and research to qualify for tenure. He stressed the importance of "refereed" articles in the promotion and tenure process.
From 1990 to 1993, plaintiff did not publish any research articles in refereed journals.[3] In fact, the only refereed article *1006 that she had published by 1996 was one article published in the American Business Perspectives. While employed at SLU she had other articles presented and published in conference proceedings.[4] During her employment at SLU plaintiff did not have any articles published in a "tier one" journal.[5] In fact, as of 1996, plaintiff had only one article published in a "tier one" journal; an article published in 1984 in the Journal of Consumer Research. Other research articles were published in the proceedings of the American Marketing Association and the American Academy of Advertising.
During plaintiff's employment with the defendant, she chaired or participated in several doctoral dissertation committees. As the result of chairing doctoral dissertation committees, plaintiff published at least two articles based upon the dissertation research. Plaintiff never declined to chair or participate on a dissertation committee since such committees often lead to opportunities for research and publication.
Early in plaintiff's employment she was requested by Dr. Miller to be the faculty advisor to the School of Business' Marketing Club. Although she voiced some concerns about becoming the faculty advisor so early in her employment, she did not decline the position. Prior to her becoming the faculty advisor, a male colleague, Dr. Paul Boughton was the faculty advisor. Plaintiff held this position until sometime in 1995-96. Following her resignation of the position, Dr. Brett Boyle, a newly hired male Associate Professor in the Business School was assigned the position.
In the April/May of the years 1991 through 1995, plaintiff received a notice of a one-year renewal of her faculty appointment as a tenure-track assistant professor. These notices of renewal do not contain any language which indicates any satisfaction or dissatisfaction with the plaintiff's work with regard to the requirements for promotion and tenure. Moreover, plaintiff received regular salary increases; however, such increases were not tied to any job performance with regard to the requirements for promotion and tenure.
As the Chair of the Marketing Department, Dr. Miller was responsible for preparing course schedules and assigning courses to be taught by the faculty. During her employment with the defendant, plaintiff was assigned three (3) 8:00 a.m. classes to teach; one was in the Fall semester of 1990, another in the Fall semester of 1991; and the last one in the Spring semester of 1995.
At SLU's Business School, faculty members are generally assigned a standard nine-hour teaching load per semester. After 1993, when Dr. Seitz became Dean, the Business School implemented a process by which a professor could be granted a course load reduction. A departmental chair could give one course release to one person each semester. In the Spring semester of 1995, plaintiff was granted the first course load reduction in the marketing department. Dr. Miller granted her a course load reduction that permitted her to teach only two courses; one being an 8:00 a.m. class and the other an evening class. Subsequent course load reductions were granted to plaintiff's fellow faculty members, a female professor  Dr. Lyn Amine, and an male professor  Dr. Arun Pereira.
On or about September 19, 1995 plaintiff requested a one-year extension of consideration for tenure due to medical reasons. This request was granted. In May 1996, due to the one-year tenure consideration extension, plaintiff received a one-year renewal of her faculty appointment as a tenure-track assistant professor. This notice *1007 did not contain any language indicating satisfaction or dissatisfaction with the plaintiff's performance with regard to the requirements for promotion and tenure.
Plaintiff was eligible to apply for tenure in the Fall of 1996. At that time, the following general procedures applied:
1. The faculty member notifies the department chair of his or her intent to apply for tenure and compiles a tenure application packet;
2. the Business School Dean's office requests student evaluation forms from a sample of the faculty member's past students;
3. the senior faculty in the department complete evaluation and recommendation forms after reviewing the application packet;
4. the department chair adds his or her recommendation and comments, then forwards the packet to the Business School's Rank and Tenure Committee;
5. the Business School's Rank and Tenure Committee review the packet and votes;
6. the vote of the Business School's Rank and Tenure Committee is forwarded to the Dean of the Business School;
7. the Dean reviews the packet, adds his or her recommendation and comments, then forwards the packet to the University Rank and Tenure Committee;
8. the University Rank and Tenure Committee reviews the packet and votes; the vote is then forwarded to the University Provost; and the Provost reviews the packet and makes the final decision as to tenure;
9. the faculty member is notified of the decision as to tenure; if tenure is denied, the faculty member is given a terminal one-year contract for the upcoming academic year.
The Business School's Rank and Tenure Committee is comprised of six (6) faculty members who are all full professors. Each Committee member is elected to represent his or her respective department with the Business School. At the time of plaintiff's tenure application, the Business School's Rank and Tenure Committee consisted of Dr. Robert Brockhaus  Chairperson, Dr. Lyn Amine (Marketing), Dr. Leroy Grossman (Economics), Dr. John P. Keithley (Accounting), Dr. Seung H. Kim (Finance), and Dr. NoKyoon Kwak (Decision Sciences). Dr. Amine was the only female member of the Committee.
In the Fall of 1996, three people applied for tenure in the Business School: plaintiff, Arun Pereira  a male colleague in the marking department, and Zane Swanson  a male colleague in the accounting department. All three prepared tenure application packets for perusal by the department chair, the Business School Dean, the rank and tenure committees, and the Provost.
During the tenure process, a candidate is evaluated, in part, on the basis of teaching performance. As part of the tenure process, the Dean's office mails an evaluation form to a random sample of students who have been in that professor's classes. With respect to the plaintiff's tenure application process, one hundred (100) letters with evaluation forms were sent to randomly picked students of her classes. All returned evaluations were assembled with her tenure packet.
In addition to the forms sent out by the Dean's office, course evaluations routinely completed by students at the end of the semester in which a course is taught are often included in a tenure applicant's packet. In her packet, Dr. Tapp included a selective group of course evaluations from students in courses she had taught from 1990-1993. She did not include all of the course evaluations, but only those that she considered to be the most positive of her teaching skills and style. She purposefully weeded out evaluations that she considered to be negative or inaccurately described her classes.
Since her packet did not include course evaluations after 1993, the Business School's Rank and Tenure Committee sought and reviewed more recent course evaluations for plaintiff. Although she did *1008 not provide these herself, she did not quarrel with the Committee's desire to have a selection of feedback from her more current students.
After the candidate submits the tenure application packet, any faculty member within the candidate's department who holds a rank higher than the applicant is invited to write a "colleague evaluation" with respect to that candidate. With respect to Dr. Tapp's tenure application, four faculty members were invited to write these evaluations: Dr. Jim Fisher, Dr. Lyn Amine, Dr. Paul Boughton, and Dr. Steven Miller.
Prior to review of her application packet by the Business School's Rank and Tenure Committee, Dr. Tapp sent a letter to the members of the Committee. In this letter, dated September 30, 1996, Dr. Tapp alleges that she has been treated unfairly by Dr. Miller as to the number of course preparations assigned. She further contends that she has not had the opportunities to publish because she has carried a heavier course load than other faculty members. She complains about being "required" to undertake the faculty advisor position for the Marketing Club. She contends that Dr. Miller will not support her tenure application because he believes her teaching skills are lacking; however, he has assigned her twice to teach a seminar course for doctoral students. Finally, she complains about the unfairness of the tenure process and her belief that she has been particularly prejudiced by Dr. Miller for personal reasons.
On or about November 8, 1996 Dr. Lyn Amine completed a colleague evaluation in which she recommended denial of tenure for the plaintiff. Although she felt that Dr. Miller could have provided closer supervision and more feedback to the plaintiff, she ultimately did not support Dr. Tapp's application because she felt that the plaintiff's teaching and research were not of an "excellent" level.
On or about November 10, 1996 Dr. Jim Fisher submitted a colleague evaluation for the plaintiff. He supported her application for promotion and tenure.
On or about November 13, 1996 Dr. Paul Boughton submitted a colleague evaluation for the plaintiff in which he recommended denial of her application for tenure. He felt that she lacked the required level of research productivity to rate "excellent" and that her teaching evaluations were not of sufficient quality to offset the weakness in her scholarly research.
On or about November 18, 1996 Dr. Steven Miller completed a colleague evaluation for the plaintiff in which he recommended denial of her application for tenure. He found the plaintiff's research and publication productivity to be extremely lacking. Although her teaching and classroom performance was quite acceptable and well received by her doctoral students, she was lacking in her teaching and classroom performance with non-Ph.D.students, especially undergraduate students.
Although plaintiff had complained in her September 30, 1996 letter about being compared to the other applicants, this was not the established process utilized by the Business School's Rank and Tenure Committee in reviewing the 1996 tenure applicants, including Dr. Tapp.
All material contained in a candidate's tenure application packet is provided by the applicant. They are responsible for choosing the nature and quantity of information to be reviewed by the Committee. The Committee does not rank candidates and each candidate is considered on his or her own merits. The Committee reviews the candidates in random order. The departmental representative from that candidate's department summarizes the information received from the candidate and provides any relevant background information. Following a discussion of the candidate and material submitted, the Committee members vote by secret ballot. The Chair counts the votes and the vote is then recorded.
*1009 In reviewing a candidate's tenure application packet, the Committee reviews each candidate's teaching, research and service record. The Committee reviews a candidate's research as a "body of evidence" and determines whether that research is sufficiently significant in terms of quantity and quality to deem that person an "excellent researcher". Routine course evaluations and the randomly selected student evaluations are reviewed for teaching and classroom performance.
During the Committee's review of Dr. Tapp's tenure packet, Dr. Amine noted the lack of current student evaluations. Accordingly, Dr. Brockhaus requested Dr. Miller to see if additional student evaluations were available for the plaintiff. In response to Dr. Brockhaus' request, Dr. Miller submitted a summary of additional student evaluations for Dr. Tapp to the Committee.
The Committee then completed its review of Dr. Tapp's tenure application packet. It concluded that her research was lacking and that although she had received generally positive evaluations from her doctoral students, her undergraduate and non-Ph.D. student evaluations were significantly less positive. Consequently, on or about December 9, 1996 the Business School Rank and Tenure Committee, through Dr. Brockhaus, informed the plaintiff that the Committee had unanimously voted not to recommend her for promotion and tenure.
As to the other tenure applicants considered at the same time as the plaintiff, the Committee voted unanimously in favor of recommending promotion and tenure for Dr. Arun Pereira and voted against granting promotion and tenure to Dr. Zane Swanson.
In late 1996, Dr. Tapp went to see Dr. Seitz about the Business School's Rank and Tenure Committee's recommendation to deny tenure to the plaintiff, and to complain about "discriminatory" treatment by Dr. Miller. Dean Seitz, after reviewing the Business School's Rank and Tenure Committee's recommendation, the colleague evaluations, the student evaluations, and other papers submitted by the plaintiff, decided that he would not support her application for promotion and tenure due because of insufficient research and lack of evidence of high-quality teaching. He communicated his recommendation to deny plaintiff's promotion and tenure to the plaintiff. He also suggested to Dr. Miller that the Committee's reasons for recommending denial of tenure be given in writing to the plaintiff.
On or about February 10, 1997, the University Rank and Tenure Committee reviewed the plaintiff's tenure application packet, as well as all evaluations and the prior recommendations to deny tenure. Dr. Donald Brennan, Chair of the University Rank and Tenure Committee prepared a form reflecting that committee's unanimous decision to recommend denial of tenure to Dr. Tapp.
On or about February 12, 1997 Dr. Brockhaus forwarded to the plaintiff a written document outlining the Business School's Rank and Tenure Committee's reasons for recommending denial of tenure to Dr. Tapp.
On or about March 20, 1997 Dr. Tapp corresponded with Provost Richard Breslin regarding an appeal of the prior recommendations for denial of tenure. As Provost, Dr. Breslin had the "final sign-off authority on rank and tenure". Dr. Tapp also went and talked with Dr. Breslin about the recommendations of denial of tenure, and her allegations of discrimination, especially with regard to Dr. Miller. Following this meeting, Dr. Tapp again wrote Dr. Breslin with regard to her tenure application and her earlier meeting with Dr. Breslin. On or about April 11, 1997 Dr. Breslin wrote plaintiff back and noted that she had misinterpreted certain statements he had made with regard to the tenure process as applied to plaintiff. He further informed her that the University Rank and Tenure Committee had also recommended denial of promotion and tenure, and that he concurred with this decision.
*1010 On or about May 16, 1997 plaintiff corresponded with Jesse Goldner, a law professor at the defendant's School of Law and the defendant's Academic Grievance Committee about further appeals of the denial of tenure. In this letter, plaintiff for the first time raised her allegation that she had been discriminated against with respect to the assignment of 8:00 a.m. classes. Professor Goldner informed the plaintiff that the Academic Grievance Committee does not involve itself with decisions regarding tenure.
On or about May 30, 1997 plaintiff was informed, in writing, by Father Garanzini, the Academic Vice-President of SLU, that she would receive a terminal contract for the 1997-98 academic school year.
On or about August 12, 1997 plaintiff contacted Vicki Riek, Interim Director of SLU's Affirmative Action Office, with respect to her denial of tenure and her allegations of sex discrimination. She was informed that she had to complete certain forms detailing her allegations. On September 16, 1997 Ms. Riek wrote plaintiff informing her that since the plaintiff never completed a "Discrimination Complaint Register Form", the Affirmative Action Office considered the matter closed. As of this date, plaintiff has never completed any forms for the defendant's Affirmative Action Office alleging discrimination with respect to the denial of tenure.
On or about August 20, 1997 plaintiff became employed by Wayland Baptist University in Plainview, Texas as a nontenure associate professor. Wayland Baptist University does not offer tenure to its faculty.
On or about February 3, 1998 Dr. Tapp filed a charge of discrimination against defendant with the EEOC. On or about June 23, 1998 the EEOC sent Dr. Tapp a "Notice of Right to Sue" noting that the EEOC could not investigate her charge because it was untimely filed.
Defendant contends that it is entitled to summary judgment for several reasons: 1) Dr. Tapp's sex discrimination claims are time-barred because she failed to file her charge of discrimination with the EEOC within 300 days after the alleged act of discrimination; i.e., the denial of tenure; 2) plaintiff has failed to make a prima facie case of sex discrimination because she was not qualified for tenure; and 3) even if plaintiff has established a prima facie case of sex discrimination, she has failed to set forth affirmative evidence that the defendant's reasons for denial of tenure were pretextual and that intentional discrimination on the basis of sex motivated the denial of tenure. Plaintiff counters that she has successfully challenged the defendant's summary judgment motion by showing that another male professor who was "less qualified" than her was granted tenure. She further contends that her teaching and research skills and performance should have been rated "excellent". Finally, she contends that she had to overcome teaching and research obstacles placed upon her by Dr. Miller that other male professors did not have to face. As to the issue of timeliness, plaintiff asserts that she filed her EEOC charge within 300 days of the final decision to deny tenure.
Defendant asserts that the decision to deny tenure was first communicated to the plaintiff on December 6, 1996 via the Business School's Rank and Tenure Committee's vote; and was subsequently communicated to the plaintiff on February 25, 1997 via the University's Rank and Tenure Committee's vote. Consequently, the defendant asserts that the plaintiff's EEOC charge was filed in excess of 300 days following the decision(s) to deny tenure. The defendant bolsters its argument by pointing out that the EEOC itself determined that the plaintiff's charge was untimely. Consequently, SLU contends that plaintiff's Title VII claim for sex discrimination is time-barred.
Generally, given the plaintiff's lack of evidence to support her assertion of timeliness, and in light of the EEOC's own determination of untimeliness, the Court would have found the plaintiff's Title VII claim to be time-barred. However, by the *1011 defendant's own extensive evidentiary record and the lack of information as to the basis for the EEOC's finding, the Court finds that the plaintiff's Title VII claim is not time-barred. The defendant's own evidence is that the Committee's votes are recommendations only; albeit they carry considerable weight in the final decision. The defendant clearly states that Dr. Breslin, as the University's Provost, is the final decision-maker as to tenure. Dr. Breslin did not communicate his decision as to the denial of tenure until April 11, 1997. Consequently, the plaintiff's charge with the EEOC was filed 298 days after the final decision to deny tenure. Thus, her Title VII claim for sex discrimination is not time-barred.
However, based upon the plaintiff's own admission, her MHRA claim for sex discrimination is time-barred. Unlike the exhaustion requirements for Title VII, the exhaustion requirement for the MHRA is jurisdictional. See, Hill v. St. Louis University, 123 F.3d 1114, 1118 (8th Cir.1997); Gipson v. KAS Snacktime, Co., 83 F.3d 225, 228 (8th Cir.1996). Plaintiff contends that the final decision to deny tenure was communicated to her on April 11, 1997. She filed her simultaneous charges of discrimination with the EEOC and the MCHR on February 3, 1998. By plaintiff's own admission, this was 298 days after the denial of tenure.
When a complaint is not filed within 180 days of the discriminatory act, the MCHR lacks jurisdiction to conduct any proceedings and the claim is barred. Hill v. St. Louis University, at 1118. A denial of tenure is a discrete, adverse employment action, similar in nature to a discharge, layoff, or failure to promote, which constitutes a "completed act at the time it occurred." Gipson, at 229 quoting Boge v. Ringland-Johnson-Crowley Co., 976 F.2d 448, 451 (8th Cir.1992). Plaintiff did not file her verified complaint with the EEOC (and constructively with the MCHR) until 298 days after the final decision to deny tenure. Thus, her complaint was filed after the 180-day statutory period had expired, and this Court lacks jurisdiction to consider her MHRA claim.
A plaintiff in a Title VII sex discrimination[6] case can proceed in one of two ways. Stacks v. Southwestern Bell Yellow Pages, 996 F.2d 200 (8th Cir.1993). When a plaintiff produces direct evidence, such as statements by decision makers clearly showing that sex was a motivating factor in the employment decision; or at least significant circumstantial evidence showing a specific link between the discriminatory animus and the challenged employment decision, the burden-shifting standards established by Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), come into play. Stacks v. Southwestern Bell Yellow Pages, 996 F.2d. at 201 n. 1; Beshears v. Asbill, 930 F.2d 1348, 1353 (8th Cir.1991). In the absence of such evidence, the guidelines set forth in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) are applicable. Stacks v. Southwestern Bell Yellow Pages, 996 F.2d. at 202; Johnson v. Minnesota Historical Society, 931 F.2d 1239, 1242-43 (8th Cir.1991); Halsell v. Kimberly-Clark, 683 F.2d 285, 289 (8th Cir.1982), citing, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), cert. den., 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983). Since there is no direct evidence or specific circumstantial evidence of sex discrimination, the Court will analyze plaintiff's discrimination claims under the McDonnell Douglas standard.
McDonnell Douglas, supra., established a three-part analysis for Title VII disparate treatment cases. Under McDonnell Douglas, a Title VII plaintiff must first establish a prima facie case of intentional discrimination by a preponderance of the *1012 evidence. If the plaintiff successfully establishes a prima facie case of intentional discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant employer meets this burden of production, the plaintiff employee must show by a preponderance of evidence that the articulated reason(s) for the challenged employment action are pretextual and that the illegitimate criterion was the motivating reason. At all times the plaintiff employee possesses the ultimate burden of proving to the Court that s/he was the victim of intentional discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Ghane v. West, 148 F.3d 979, 981 (8th Cir.1998); McCullough v. Real Foods, 140 F.3d 1123, 1126-27 (8th Cir.1998); Rose-Maston v. NME Hospitals, 133 F.3d 1104, 1107-08 (8th Cir. 1998); Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir.1997); Rothmeier v. Investment Advisers, 85 F.3d 1328, 1332 (8th Cir.1996); Ruby v. Springfield R-12 Public School Dist., 76 F.3d 909, 911-12 (8th Cir.1996); Favors v. Fisher, 13 F.3d 1235, 1237-38 (8th Cir.1994). The plaintiff must do more at the pretext stage than simply discredit the defendant's reason(s), the plaintiff must show that the articulated reason(s) is a pretext for intentional discrimination. St. Mary's Honor Center, 509 U.S. at 515-16, 113 S.Ct. 2742; Ryther, at 837.
In standard sex discrimination cases involving a failure to promote, the plaintiff establishes a prima facie case by demonstrating that she was 1) a member of a protected class; 2) that she was qualified for the position sought; 3) that she was denied the position; and 4) that the position sought was given to a male. Since a tenure case is most analogous to a denial of promotion case, this Court determines that Dr. Tapp can establish her prima facie case by demonstrating that 1) she is a member of a protected class; 2) that she was qualified for promotion and tenure in the defendant's Business School; 3) that she was denied promotion and tenure; and 4) that promotion and tenure was given to one or more male colleagues.
Defendant contends that plaintiff cannot establish that she was qualified for promotion and tenure under the Business School's criteria for tenure. Plaintiff argues that her work should have been considered as "excellent" and meeting the Business School's criteria.
It is undisputed that the Business School requires, among other things, that its tenure applicants rate as "excellent" in the categories of research and teaching; however, if an applicant has a strong showing of "excellent" in only one of these categories, s/he may still be granted tenure if they rate as "good" in the other category. The uncontroverted evidence before the Court shows that the vast majority of faculty and administrators who reviewed plaintiff's tenure application found her lacking in both these categories. All but one of plaintiff's colleague evaluations from the marketing department were negative and recommended denial of tenure. The Business School Rank and Tenure Committee unanimously voted to recommend denial of tenure based upon a deficiency in both research productivity and teaching performance. The Department Chair's recommendation for denial noted the same deficiencies. The Dean of the Business School recommended denial of tenure. The University Rank and Tenure Committee unanimously voted to recommend denial of tenure. Finally, the Provost affirmed the recommendations of denial of tenure based upon all of the findings contained in the evaluations and recommendations.
Plaintiff has not offered a scintilla of evidence that any step of the tenure process was tainted by sex discrimination. She cannot point to any gender bias contained in the comments on any of the faculty evaluations, student evaluations, or votes by the committees.
Her only "evidence" of gender bias within the tenure process is an allegation that *1013 evaluations were removed from her packet and/or more evaluations were considered in a male colleague's tenure packet. Firstly, plaintiff's submission of "evidence" is woefully lacking in her challenge to the summary judgment motion. Her brief is devoid of citations to any legal authority, and more importantly, although she cites to portions of deposition testimony of six (6) witnesses, she totally fails to provide the cited deposition testimony.[7] Consequently, this allegation (as do most of her allegations regarding discriminatory treatment) are not supported by any evidence in the record. In order to withstand a motion for summary judgment, the non-moving party must substantiate his or her allegations with sufficient probative evidence which would permit a finding in his or her favor based on more than mere speculation, conjecture, or fantasy. Wilson v. I.B.M., 62 F.3d 237, 241 (8th Cir. 1995); Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir.1994).
In fact, the evidence before the Court is that the plaintiff herself elected to withhold certain student evaluations from her tenure packet. Furthermore, she conceded that it was reasonable for the Business School Rank and Tenure Committee to review additional current student evaluations when considering her application for tenure.
Unlike the plaintiff in Kobrin I, supra., Dr. Tapp has not produced sufficient evidence that she was objectively qualified for the tenured position of associate professor. She has not produced any evidence which even remotely challenges the accuracy of the findings of her colleagues and the committees' recommendations. Consequently, plaintiff has failed to produce sufficient evidence to create a genuine issue of material fact as to whether she was qualified for promotion and tenure as an associate professor in the Business School.
Assuming arguendo that Dr. Tapp had established her prima facie case of sex discrimination, she would ultimately fail to withstand the summary judgment motion on discriminatory denial of tenure because she has failed to present any evidence of pretext and evidence from which a reasonable jury could infer that she was denied tenure on the basis of gender.
Upon establishment of the prima facie case, the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for its adverse employment decision. The defendant avers that plaintiff was denied tenure based upon negative student evaluations, negative colleague evaluations, and negative recommendations from tenure committees and administrators. The defendant has provided ample evidence to support these reasons. Thus, the presumption of discrimination created by the prima facie case is effectively rebutted. Rose-Maston, at 1108; Ryther, at 837.
To survive defendant's summary judgment motion, plaintiff must "establish the existence of facts which, if proven at trial, would permit a jury to conclude that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions." Krenik v. County of LeSueur, 47 F.3d 953, 958 (8th Cir.1995); see also, Rothmeir v. Investment Advisers, Inc., at 1334-37. Thus, Dr. Tapp must present affirmative evidence which creates a fact issue as to whether SLU's proffered reason(s) are mere pretext; and must present affirmative evidence which creates a reasonable inference that the decision not to grant tenure was the result of intentional sex discrimination. Rose-Maston, at 1108 citing Rothmeier, at 1336-37; see also, McCullough v. Real Foods, Inc., 140 F.3d 1123, 1127-29 (8th Cir.1998).
*1014 After reviewing the evidentiary record before the Court, the Court determines that the plaintiff has failed to meet her burden of creating an issue of fact as to whether SLU's proffered reason(s) for denying tenure was pretextual. Plaintiff's assertion that the reasons for denial of tenure were pretextual has three primary components: 1) her student evaluations were not negative and Dr. Fisher recommended granting tenure; 2) Dr. Miller engaged in discriminatory acts with the intention of "sabotaging" her ability to meet the level of "excellent" in teaching and research; and 3) Dr. Fisher was granted tenure even though he was "less qualified" than the plaintiff.
Plaintiff claims that her student evaluations were positive, especially with regard to her doctoral students, and that the defendant ignored the favorable recommendation from Dr. Fisher. She further claims that another tenure applicant, Arun Pereira, had many more student evaluations in his application packet than she did. Defendant does not dispute the fact that plaintiff's application packet did include some favorable student evaluations; however the majority of these evaluations were from doctoral students and for the years 1990-1993. It is also true that a great number of student evaluations from Dr. Tapp's undergraduate and non-Ph.D. students were highly critical of her teaching methods. Furthermore, the majority of the faculty evaluations recognized this variance; praising plaintiff for her teaching prowess as to doctoral students, but highlighting her failings when it came to teaching undergraduate and non-Ph.D. students. Plaintiff herself recognized the fact that her teaching strength was with doctoral students only. It is clear that plaintiff's teaching skills were not "across-the-board" positively perceived. The Court cannot quantify the student evaluations as a certain percent negative and a certain percent positive and hold the defendant to some artificial standard as to when, based on these magical percentages, tenure should or should not be denied. "It is not for us to determine what constitutes a sufficient amount of negative feedback from students before a denial of tenure is justified; we will not sit as a `super personnel council' to review tenure decisions." Brousard-Norcross, at 976.
As to Dr. Fisher's recommendation, the fact that one faculty member recommended tenure cannot reasonably override the fact that every other faculty member evaluation, including a female faculty member's evaluation, recommended denial of tenure. Moreover, all members of each committee voted against tenure, as well as every administrator who reviewed plaintiff' package.
Finally, as to the number of student evaluations reviewed, plaintiff concedes that the committees had the right to review more current evaluations. Furthermore, it was Dr. Amine, plaintiff's female colleague, who requested the additional evaluations. Finally, plaintiff's original submission of student evaluations was a product of her own efforts. Initially, the number and nature of the student evaluations were of her own choosing.
Plaintiff neither alleges nor provides any evidence that any of the evaluations, student or faculty, are gender-based in any way. Student and faculty reactions as to plaintiff's teaching style and performance are a useful and legitimate, non-discriminatory factor for the defendant to consider in its tenure decision. Brousard-Norcross, at 976.
Next, plaintiff makes various allegations against Dr. Miller, primarily as to course assignment, number of course preparations assigned, and class times assigned. As stated before, plaintiff's allegations are not supported by any affirmative evidence in the record. She questions Dr. Miller's negative comments (on his recommendation form) as to her teaching skills, while simultaneously asserting that she was assigned to teach a doctoral course more than once, and served on several doctoral dissertation committees. The record shows that plaintiff's teaching strength was with doctoral students, not undergraduate *1015 or non-Ph.D. students. This fact was well-recognized by both Dr. Miller and the plaintiff. There is nothing discriminatory about having a strong teacher of doctoral students teach a doctoral course, even if more than one time.
As to the number of course preparations, plaintiff provides nothing to back up her allegations. She has not shown that the number of course preps were unequal among female and male faculty members. At her deposition, plaintiff conceded that she had never raised this issue with Dr. Miller, and that in fact, she had no evidence to support her subjective belief that she had been assigned more course preps than other faculty members. Plaintiff's deposition, pgs. 107-112.
As to the assignment of 8:00 a.m. classes, once again the record does not support plaintiff's allegation that she was discriminatorily assigned more 8:00 a.m. classes than other male faculty members. The record shows that in twelve (12) semesters of teaching at SLU, plaintiff was assigned three (3) a.m. classes: one in the first semester in the Fall of 1990, another in the first semester in the Fall of 1991, and finally, one in the second semester in the Spring of 1995. Furthermore, in the Spring of 1995, plaintiff taught only two (2) classes, the 8:00 a.m. class and an evening class. Dr. Pereira testified that he also taught 8:00 a.m. classes and really didn't give it much thought about when his class times were assigned. Pereira deposition, pgs. 44-45. Plaintiff has failed to provide any evidence that she taught more 8:00 a.m. classes than any other male faculty member, or that she was assigned 8:00 a.m. classes due to her gender.
Plaintiff alleges discriminatory distribution of course load reductions by Dr. Miller. The record shows that plaintiff, upon asking, received the first course load reduction handed out in the marketing department in the Spring of 1995. Plaintiff fails to provide any evidence that she asked for additional course load reductions and was denied same. The record further shows that two other marketing department professors received course load reductions: Dr. Amine and Dr. Pereira. The record is devoid of any affirmative evidence to support plaintiff's claim that course load reductions were distributed in a discriminatory manner.
Finally, plaintiff alleges that she was compelled to be the faculty advisor to the Marketing Club, while male faculty members were not so compelled. The record shows that prior to plaintiff becoming the faculty advisor, a male colleague Dr. Paul Boughton, held the position; and after plaintiff resigned, another male colleague Dr. Brett Boyle, became the Club's advisor. The record further shows that although plaintiff voiced some concerns about the time commitment as faculty advisor, she never informed Dr. Miller that she would not take the position.
Dr. Miller may not have been the ideal supervisor for the plaintiff and perhaps more feedback could have been given to plaintiff as to her teaching problems with undergraduates and non-Ph.D. students; however, Dr. Miller's supervisory style is not the issue before the Court. Plaintiff fails to provide any affirmative evidence that Dr. Miller treated plaintiff differently from her male colleagues with respect to course preps, class assignments, etc. There is simply nothing before the Court which raises any reasonable inference that any of Dr. Miller's actions as departmental head were discriminatorily based upon plaintiff's gender.
Finally, plaintiff attempts to show pretext by comparing her qualifications for tenure with the qualifications of Dr. James Fisher. This attempt to show pretext by comparing her credentials with those of Dr. Fisher must fail for the simple reason that plaintiff is attempting to compare herself to an individual who is not similarly situated to her in all relevant aspects.
In a sex discrimination case, instances of disparate treatment can support a claim of pretext, but a plaintiff must prove that she and other male employees *1016 were similarly situated in all relevant respects. Feltmann v. Sieben d/b/a/ Plaza Motors Co., 108 F.3d 970, 974 (8th Cir. 1997). Here, Dr. Tapp must show that she was treated differently from similarly situated male colleagues with respect to the tenure process in order to demonstrate pretext. The record clearly establishes that Dr. Fisher and Dr. Tapp cannot be considered "similarly situated" with respect to the tenure process.
Dr. Fisher was granted tenure in 1990, some six (6) years prior to defendant's denial of tenure to Dr. Tapp. Drs. Tapp and Fisher were considered for tenure under different Business School Deans (Dr. Seitz did not become dean of the Business School until 1993). The members of the Business School Rank and Tenure Committee differed for these years (e.g. Dr. Brockhaus did not become Chairman of the Business School Rank and Tenure Committee until 1996). Dr. Breslin was the Provost in 1996 but was not the Provost in 1990. It would also seem reasonable to assume that different faculty provided recommendations, and that different members comprised the University Rank and Tenure Committee. The fact is that different people were involved in the two tenure decisions. "When different decision-makers are involved, two decisions are rarely `similarly situated in all relevant respects'". Harvey v. Anheuser-Busch, 38 F.3d 968, 972 (8th Cir.1994) citing Jones v. Frank, 973 F.2d 673, 676 & n. 3 (8th Cir.1992).[8]
With respect to plaintiff's persistence in challenging the decision-makers' evaluations of her work (teaching and research) and their conclusions that she did not "qualify" for tenure, the Court suggests that all plaintiff is attempting to do is create an issue of fact over a mere dispute as to her qualifications for tenure. Simply arguing that she was qualified for tenure is not enough, she had to produce evidence of "such strength and quality as to permit a reasonable finding that the denial of tenure was obviously unsupported." Kobrin II, at 704, n. 4; Kobrin I, at 414; see also, Brousard-Norcross, at 976, n. 3. ("[s]tatements of peer judgments as to departmental needs, collegial relationships, and individual merit may not be disregarded absent evidence that they are a facade for discrimination."). Plaintiff has offered no affirmative evidence that any evaluations, comments, conclusions were tainted by gender-bias. She has failed to establish any factual dispute with respect to whether SLU's stated reasons for her tenure denial are pretexts for unlawful sex discrimination. Summary judgment will be granted to the defendant, as a matter of law, on plaintiff's Title VII claim of sex discrimination.
As to plaintiff's sex discrimination claim under Title IX[9], the Court determines that this claim must also fail for the same reasons plaintiff's Title VII claim fails.[10] Since plaintiff's Title IX claim fails as a matter of law, the Court need not address *1017 whether Title IX affords her a duplicative private right of action.[11]
Having failed to established any material issues of fact as to defendant's decision to deny tenure, defendant is entitled to judgment as a matter of law, on plaintiff's claim of sex discrimination under Title VII and Title IX.[12]
NOTES
[1] A great deal of factual background was provided by the parties regarding plaintiff's original claim of disability discrimination. In light of the fact that this claim has now been dismissed by the plaintiff, the Court will only review those facts germane to the plaintiff's claim of sex discrimination. Furthermore, within the general allegations contained in the plaintiff's complaint is a vague allegation that defendant "retaliated" against the plaintiff, after she complained of discrimination, by seeking reimbursement of salary advanced to plaintiff in the summer of 1997. However, this allegation of "retaliation", as well as other allegations regarding unequal treatment, are not advanced by the plaintiff as separate claims under Title VII. By plaintiff's own remarks in her responsive pleading, these allegations are not actionable claims, but rather her "evidence" of the discrimination regarding her denial of tenure. Consequently, this Court finds that the only claim advanced by plaintiff at this time is a claim for discriminatory denial of tenure. Thus, the adduced factual background will be limited to this claim only.
[2] Within this memorandum, the Court will address defendant as "St. Louis University", "the University", or "SLU".
[3] A refereed journal article is an article submitted to a journal which is subject to peer review.
[4] Conference proceedings articles are papers presented at a professional academic conference and then bound into a volume. These papers often are preliminary to more advanced researched articles published in journals.
[5] A "tier" level of a journal is based on the quality of the journal and is determined within the profession.
[6] The Court will address the issue of the plaintiff's Title IX claim of sex discrimination later in this memorandum.
[7] Plaintiff attaches the cited pages only for the deposition transcript of James E. Fisher; all other "exhibits" are nothing more than the deposition cover page and the first page of the deposition. Furthermore, these "exhibits" are not attached to plaintiff's brief in response to the summary judgment motion, but rather are attached to plaintiff's "Response to Defendant's Statement of Facts". Their connection to that pleading escapes the Court.
[8] The Court concurs that the male colleague most similarly situated to Dr. Tapp is Dr. Pereira. He and Dr. Tapp were the only professors from the marketing department considered for tenure in 1996 and whose tenure application packets were considered by all of the same decision-makers. The defendant provides the tenure application packet for the Court's perusal. Without deciding whether Dr. Pereira was "more qualified" than plaintiff, the Court simply notes that Dr. Pereira's published research is quite extensive in both "refereed" and "tier one" journals, his student evaluations were quite complimentary at all levels of student teaching, and that his faculty recommendation for the most part were extremely positive.
[9] Section 901(a) of Title IX of the Education Amendments of 1972 provides that "no person", on the basis of sex, shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."
[10] The method of evaluating Title IX gender discrimination claims is the same as those in a Title VII case. Johnson v. Baptist Medical Center, 97 F.3d 1070, 1072 (8th Cir.1996) citing O'Connor v. Peru State College, 781 F.2d 632, 642 (8th Cir.1986).
[11] The Court notes that the circuits are not in agreement as to whether Title IX provides an independent private cause of action for discrimination in educational employment. The Eighth Circuit Court of Appeals has never directly addressed this issue. As in Brine v. University of Iowa, 90 F.3d 271, 276 (8th Cir.1996), defendant does not challenge the proposition that a private right of action exists under Title IX. Consequently, this Court will not address this issue at this time. However, for a thorough review of this issue, see Judge Catherine D. Perry's memorandum and order, dated January 5, 1998, in Amine v. St. Louis University, Cause No. 4:97CV246CDP.
[12] Even if plaintiff's MHRA claim were not time-barred, it would still fail for the same reasons as the Court stated with regard to plaintiff's Title VII claim. The same analysis is applicable to both Title VII and MHRA claims. Kehoe v. Anheuser-Busch, 96 F.3d 1095, 1101, n. 8 (8th Cir.1996); Lane v. Ground Round, 775 F.Supp. 1219, 1223 (E.D.Mo.1991).